**JOHNSON FISTEL, LLP**
Frank J. Johnson (SBN 174882)
FrankJ@johnsonfistel.com
Brett M. Middleton (SBN 199427)
BrettM@johnsonfistel.com
Jonathan M. Scott (SBN 323322)
JonathanS@johnsonfistel.com
Bryan Wyman (SBN 348625)
BryanW@johnsonfistel.com
501 West Broadway, Suite 800
San Diego, California 92101
Telephone: (619) 230-0063

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CURTIS SPATHIAS, derivatively on behalf of PAYPAL HOLDINGS, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL SCHULMAN, JOHN RAINEY, JONATHON AUERBACH, LOUISE PENTLAND, ANN SARNOFF, RODNEY C. ADKINS, ALEX CHRISS, JONATHAN CHRISTODORO, CARMINE DISIBIO, SAVID W. DORMAN, ENRIQUE LORES, GAIL J. MCGOVERN, DEBORAH M. MESSEMER, DAVID M. MOFFETT, AND FRANK D. YEARY<br><br>Defendants,<br><br>-and-<br><br>PAYPAL HOLDINGS, INC., a Delaware corporation,<br><br>Nominal Defendant. | Case No. 5:25-cv-1007<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u><br><br>Judge:<br>Ctrm.: |

# TABLE OF CONTENTS

I. NATURE AND SUMMARY OF THE ACTION ..... 1
II. JURISDICTION AND VENUE ..... 3
III. THE PARTIES ..... 4
IV. SUBSTANTIVE ALLEGATIONS ..... 5
A. PayPal's Corporate History And Primary Business ..... 5
B. Paypal Saw Tremendous Growth During The Pandemic ..... 7
C. The Individual Defendants' False And Misleading Statements ..... 9
D. The Foregoing Statements Were False And Misleading ..... 30
E. The Truth Is Fully Revealed ..... 30
F. Insider Trading ..... 33
V. DUTIES OF THE INDIVIDUAL DEFENDANTS ..... 36
A. Defendants' Fiduciary Duties ..... 36
B. Control, Access, And Authority ..... 38
C. Reasonable And Prudent Supervision ..... 39
VI. BREACHES OF DUTIES ..... 40
VII. DAMAGES TO PAYPAL ..... 40
VIII. DERIVATIVE AND DEMAND ALLEGATIONS ..... 41
A. Plaintiff's Demand Allegations ..... 42
IX. CLAIMS FOR RELIEF ..... 45
X. PRAYER FOR RELIEF ..... 49
XI. DEMAND FOR JURY TRIAL ..... 51

Plaintiff Curtis Spathias ("Spathias" or "Plaintiff"), by and through his undersigned counsel, brings this shareholder derivative action on behalf of Nominal Defendant PayPal Holdings, Inc. ("PayPal" or the "Company") against certain current and/or former officers and directors of the Company for violations of law, including breaches of fiduciary duties, unjust enrichment, and for contribution for violations of Section 10(b) of the Exchange Act. Plaintiff make these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (i) review and analysis of public filings made by PayPal and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of documents produced in response to a document demand pursuant to 8 Del. C. §220 (the "Document Demand"); (iii) review of press releases and publications disseminated by the Company, certain of the defendants and other related non-parties; (iv) review of news articles, shareholder communications, and postings on PayPal's website concerning the Company and relevant public statements; (v) publicly available pleadings, papers, and court documents, including any documents filed with and publicly available from the related pending securities fraud class action, *In re PayPal Holdings, Inc. Securities Litigation*, No. 3:22-cv-05864-RK-JTQ (D.N.J.) (the "Securities Class Action"); and (vi) review of other publicly available information concerning PayPal and the Individual Defendants (defined below).

## I. NATURE AND SUMMARY OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of Nominal Defendant PayPal against certain current and former officers and directors for breaches of fiduciary duty and other violations of law beginning February 2021. These wrongs have resulted in tens of millions of dollars in damage to the Company. PayPal's Board of Directors (the "Board") has taken no action to address any of these wrongs to the Company.

2. PayPal is a technology company which hosts an online payment platform that allows merchants and consumers to buy and sell goods and services.

3. Starting as early as February 2021, the Individual Defendants (defined below) made, allowed to be made, or failed to correct, materially false and/or misleading statements to PayPal shareholders and the public (*e.g.* boasting about the number of Net New Active accounts ("NNAs")

in SEC filings, press releases, and on conference calls) while failing to disclose important adverse information about PayPal's operations and financial forecast (*e.g.* concealing the exploitation of Company's incentive programs was causing the Company to report inflated NNA numbers). As a result, the Company's share price was artificially inflated. The Individual Defendants took advantage of these inflated prices and sold tens of millions of dollars in stock at inflated prices.

4. During the COVID-19 pandemic (the "Pandemic"), PayPal experienced a sharp increase in users due to business and customers needing to adjust to social distancing guidelines. The Company reported that 2020 was the "Strongest performance in PayPal's history." The Company's reported revenue for 2020 was $21.45 billion, a 21% increase from 2019, and added 72.7 million NNAs.

5. Beginning on February 3, 2021, when PayPal announced its Q4 2020 and FY20 financial results, the Individual Defendants began to make false and misleading statements concerning the Company's growth metrics, particularly NNAs. For example, on the February 3, 2021, earnings call Defendant Daniel Schulman, then the Company's Chief Executive Officer ("CEO"), told an analyst the Company expected to add approximately 50 million NNAs in 2021.

6. The Individual Defendants continued to make similar materially false and misleading statements thereafter. Then, on February 1, 2022, Rainey shocked the market and publicly revealed to investors that PayPal had ***identified millions of illegitimate accounts*** previously reported as in each of the Company's quarterly results for FY21. Additionally, Rainey admitted these illegitimate accounts were the ***result of abuses of the Company's incentive programs***.

7. On July 26, 2024, Plaintiff issued a Demand for the Inspection of Books and Records pursuant to §220 (the "Document Demand"). The Company ultimately produced highly redacted documents in response to the Document Demand. Upon the completion of Plaintiff's counsel's review of the books and records, Plaintiff authorized the issuance of a written demand which was served on the Board on July 31, 2024 (the "Litigation Demand.") The Litigation Demand directed the Board to investigate and take necessary legal action against those responsible for the damage the Company had sustained as a result of the wrongdoing described herein.

8. In November and December 2024, Plaintiff's counsel and counsel for the Board engaged in a series of discussions concerning tolling agreements with the Individual Defendants. However, counsel for the Board stated the Board would not seek a tolling agreement with Defendant Louise Pentland for various reasons. Plaintiff does not believe the Board has sought a tolling agreement to preserve the Company's valuable claims against Pentland as the statute of limitations is set to expire, nor has Plaintiff received any confirmation of other tolling agreements being executed with the other Individual Defendants.

9. By refusing to seek a tolling agreement to preserve the Company's valuable claims against the Individual Defendants, the Board has failed to act in good faith, and within the bounds of the realm sound business judgement.

10. In response to the Board's unreasonable failure to preserve the Company's valuable claims, Plaintiff has filed this action alleging breaches of fiduciary duties, unjust enrichment, misappropriation of material, non-public information, and for contribution for violations of federal securities laws. Because the Board's failure to preserve the Company's valuable claims is at odds with the Board's fiduciary duties, as detailed herein, this derivative action should be permitted to proceed for the benefit of the Company and its shareholders.

## II. JURISDICTION AND VENUE

11. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934 and contribution for violations of Section 10(b) of the Exchange Act. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

12. This action is not a collusive action designed to confer jurisdiction on a court of the United States it would not otherwise have.

13. This Court has personal jurisdiction over each defendant because PayPal maintains its corporate headquarters in this district or each defendant is conducting business and maintaining operations in this District or is an individual who is either present in this District for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone

communications, and the facilities of the national securities exchanges and markets, thus each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1401, Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1391(b), (c), and (d). PayPal maintains its corporate headquarters in this district, and many of the acts and conduct constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information to shareholders in this judicial district. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. THE PARTIES

**Plaintiff**

15. Plaintiff Curtis Spathias is a current holder of PayPal common stock and has been at all relevant times. Plaintiff is serving as the sole representative plaintiff in this "demand refused" shareholder derivative action as alleged herein.

**Defendants**

16. Nominal Defendant PayPal is incorporated under the laws of the State of Delaware and has its principal executive offices located at 2211 North First Street, San Jose, California 95131. PayPal stock trades on NASDAQ under the symbol "PYPL."

17. Defendant Daniel Schulman ("Schulman") served as the Company's Chief Executive Officer ("CEO") and as a director until September 2023. Defendant Schulman is a named defendant in the Securities Class Action.

18. Defendant John Rainey ("Rainey") served as the Company's Chief Financial Officer ("CFO") until May 2022. Rainey is a named defendant in the Securities Class Action.

19. Defendant Jonathon Auerbach ("Auerbach") serves as an Executive Vice President. He currently advises on the Company's operations in China and is responsible for the Company's

Blockchain, Crypto and Digital Currencies business unit. Auerbach is a named defendant in the Securities Class Action.

20. Defendant Louise Pentland ("Pentland") served as the Company's Chief Business Affairs and Legal Officer until December 2021, and as an Executive Vice President until July 2022.

21. Defendant Ann Sarnoff ("Sarnoff") has served as a director since June 2017.

22. Defendant Rodney C. Adkins ("Adkins") has served as a director since September 2017.

23. Defendant Alex Chriss ("Chriss") has served as a director since August 2023.

24. Defendant Jonathan Christodoro ("Christodoro") has served as a director since July 2015.

25. Defendant Carmine DiSibio ("DiSibio") has served as a director since July 2024.

26. Defendant Savid W. Dorman ("Dorman") has served as a director since June 2015.

27. Defendant Enrique Lores ("Lores") has served as a director since July 2024.

28. Defendant Gail J. McGovern ("McGovern") has served as a director since June 2015.

29. Defendant Deborah M. Messemer ("Messemer") has served as a director since January 2019.

30. Defendant David M. Moffett ("Moffett") has served as a director since June 2015.

31. Defendant Frank D. Yeary ("Yeary") has served as a director since July 2015.

32. Defendants Schulman, Rainey, Auerbach, Pentland, and Sarnoff are sometimes referred to herein as the "Individual Defendants."

33. Defendants Adkins, Chriss, Christodoro, DiSibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary are sometimes referred to herein as the "Director Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. PayPal's Corporate History And Primary Business

34. PayPal was originally founded in 1998 as Confinity, and it aimed to develop digital payment methods for customers and businesses. In 2000, Confinity merged with X.com, an online bank, and in 2001 the combined company changed its name to PayPal. In 2002, the Company

conducted an IPO and was later acquired by eBay, Inc. ("eBay") as a wholly owned subsidiary for $1.5 billion. PayPal as it exists today was created in 2015 when it was spun off from eBay.

35. PayPal's primary source of revenue is its payment platform, which facilitates online transactions between merchants and users. PayPal uses certain key metrics to track the health of its business, including churn, Net New Active accounts ("NNAs"), and Transactions per Account. PayPal often discloses these metrics to shareholders to demonstrate the success of PayPal's business.

36. In 2015, PayPal became an independent company once again and started trading on the Nasdaq stock exchange as "PYPL." Xoom joined PayPal, making it purportedly easier for customers to send money across borders at a lower cost than traditional money transfers.

37. Then, in 2016, PayPal announced a partnership agreement with Visa Inc. to expand consumer choice in payments. Since that time, PayPal has forged more than 40 strategic partnerships, including with leading banks like Bank of America, Banorte, Barclays, Citi, HSBC, JPMorgan Chase, ShinhanCard and Wells Fargo, card networks and issuers like American Express, Discover, Mastercard and other financial institution partners like FIS, Paymentus and Synchrony.

38. In 2017, Swift Financial joined PayPal and expanded PayPal's small business financing solutions.

39. In 2018, PayPal acquired several companies to expand its platform, including: (i) Zettle joined PayPal to create an in-store shopping experience; (ii) Hyperwallet joined PayPal to expand payout capabilities for businesses on a global scale; and (iii) Simility joined PayPal, adding enhanced risk services and fraud detection.

40. In 2019, PayPal became the first foreign payment platform to be approved for online payment services in China.

41. In 2020, as the COVID-19 Pandemic (the "Pandemic"), disrupted everyday life, PayPal committed $535 million to close the racial wealth gap and support Black and underserved businesses and communities in the U.S. Honey, Inc. ("Honey") joined PayPal to create "rewarding shopping experiences" and save people money.

42. In 2021, PayPal and Venmo launched a new digital wallet service, providing people with a single destination to manage their financial lives. PayPal also introduced Checkout with

Crypto, offering customers a purportedly safe, easy and seamless way to pay using cryptocurrencies. Paidy joined PayPal in 2021 to expand PayPal's presence in Japan and its global portfolio of buy now, pay later solutions.

43. In 2022, PayPal introduced Passkeys to replace passwords and allow seamless logins for consumers across devices and platforms. Also this year, PayPal began a new chapter with a global brand refresh.

44. In 2023, PayPal introduced a U.S. dollar-denominated stablecoin, PayPal USD (PYUSD). As the only stablecoin supported within the PayPal network, PayPal USD purportedly leverages PayPal's decades-long experience in payments at scale, combined with the speed, cost and programmability of blockchain protocols. Venmo rolled out a series of new enhancements, including crypto transfers, the Venmo Teen Account and Venmo Groups, designed and intended to increase accessibility and deliver more choice and flexibility for users.

45. In 2024, PayPal and Venmo unveiled six new innovations to revolutionize commerce "through artificial intelligence (AI) driven personalization for both merchants and consumers."

**B. Paypal Saw Tremendous Growth During The Pandemic**

46. During the Pandemic, PayPal saw huge amounts of growth as people began using the Company's payment platform at much higher rates. As businesses and consumers in the United States, and around the world, tried to adapt to social distancing guidelines, many turned to PayPal as a way to buy and sell goods and services. In an August 13, 2020, interview with Mad Money host Jim Cramer, Schulman claimed, "[w]hat I think what's happened is the world has accelerated from physical to digital across every industry."[1] Schulman continued, "[a]cross every industry, we're seeing this surge towards a digital-first strategy, and all of the tools and products and services that we offer are probably more relevant and important across multiple industries than they've ever been before[.]"[2]

---

[1] https://www.cnbc.com/2020/08/13/the-pandemic-has-made-paypal-more-relevant-than-ever-before-ceo-says.html

[2] *Id.*

47. During the Company's 2020 fiscal year, PayPal began to post record high revenues and growth. For example, beginning in the second quarter of fiscal year 2020, PayPal's NNAs exploded as they report over 21 million NNAs for that quarter. This was a 100% increase from the prior quarter where the Company only reported 10 million NNAs, not including the approximately 10 million NNAs the Company reported due to its acquisition of Honey, a mobile payments network. The Company reported 15.2 million and 16 million NNAs for its third and fourth quarters, respectively.

48. Further, around the same time, the Company began to post record high revenues compared to previous years. For example, the Company reported approximately $5.3 billion in revenue for the second quarter of 2020, a 22% increase from the previous year. In the Company's third quarter, the Company reported approximately $5.5 billion, a 25% increase. Lastly, the Company reported approximately $6.1 billion in its fourth quarter, a 23% increase.

49. In an attempt to keep these users, the Company implemented numerous easily abused promotions in an attempt to drive continued NNA growth. For example, PayPal ran a promotion where someone simply needed to go to a particular page on PayPal's website and create an account, then they would receive $5 in that account. Other promotions required the user to complete an "eligible transaction" to receive the promotion incentive. While these promotions were ongoing, many tutorials appeared online, particularly on Chinese social media, ***explaining how to exploit these promotions to make money***.

50. The Securities Class Action Amended Complaint (the "Amended Complaint") contains numerous allegations from confidential witnesses which state the Individual Defendants, particularly Rainey, were aware of the exploitable nature of these promotions, yet chose to do them anyways. For example, the Amended Complaint makes the following allegation concerning former employees voicing the risks related to these promotions:

> Specifically, CW-4 stated that he was in the "inner circle" at PayPal, which included CEO Schulman and CFO Rainey. CW-4 recalled that before the start of 2021, he voiced concerns in a room of senior executives, including Senior Vice President, Chief Compliance Officer Fiachre O'Neill, regarding the risk that ***the promotion to pay people to open accounts would lead to people opening accounts without otherwise using PayPal's services***. CW-4 recalled that others in the room also expressed concerns about

> this risk, but that ultimately PayPal decided to proceed with the use of the incentive payments anyways.

*Id.* at ¶75. The Amended Complaint contains numerous similar allegations from CW-4 and other confidential witnesses. *See Id.* at Section IV.b.ii.

**C. The Individual Defendants' False And Misleading Statements**

**1. February 3, 2021**

51. On February 3, 2021, after the market closed, PayPal reported its financial results on Form 8-K for the fourth quarter and full fiscal year ended December 31, 2020. The 4Q2020 and Full Year 2020 8-K stated:

> "***FY'21: Expect ongoing momentum with strong TPV growth and NNAs . . . ~50 million NNAs expected to be added to PayPal's platform in FY'21***."

52. PayPal's Investor Update presentation reiterated its NNA guidance for 2021:

## FY-21 Guidance

**Expect ongoing momentum with strong TPV growth and NNAs**

| | |
|---|---|
| Revenue (in billions) | ~$25.5 |
| Revenue Growth (Spot) | ~19% |
| Non-GAAP EPS Growth | ~17% |
| Free Cash Flow (in billions) | ~$6.0 |

- Non-GAAP effective tax rate of ~17-19%
- CAPEX ~3% of revenue
- GAAP EPS of ~$3.20

- **TPV:** Expect **TPV growth in the high 20's** on a percentage basis
- **NNAs:** Expect to add ~50 million NNAs in FY-21
- **Revenue:** Expect ~19% spot and ~17% FX-neutral revenue growth
  - Expect variability in revenue and earnings growth rates from quarter-to-quarter with Q1-21 representing the highest level of growth
  - Factors impacting the cadence of quarterly expectations include: lapping 2020 performance, cadence of investments/product introductions, travel & events recovery, credit
  - **eBay impact:** Revenue outlook includes expected ~4pts of headwind from eBay's managed payments transition
- **Op margins:** Expect **modest non-GAAP operating margin expansion** while balancing investment in organic growth with operating efficiencies
- Expect higher interest expense and a higher tax rate (relative to FY-20) to offset much of the non-GAAP earnings benefit from op margin expansion; expect OI&E to be a net expense through FY-21
- Expect Non-GAAP EPS growth of ~17% and GAAP EPS of ~$3.20, compared to $3.54 in FY-20, which benefitted from $1.24 in net gains on strategic investments

Non-GAAP EPS is a Non-GAAP financial measure. Please see the Supplemental Information for a reconciliation of this Non-GAAP financial measure to the most directly comparable GAAP financial measure.

PayPal ©2021 PayPal Holdings Inc. Q4-20 Investor Update • 21

53. That same day, the Company hosted a conference call to discuss its quarterly results. During the call, Schulman stated:

> In the quarter, we added 16 million net new active customers, including an incremental 1.4 million new merchants. For the year, we delivered a record 73 million net new actives, ending the year with 377 million active accounts, up 24%. We now have over

> 29 million merchants interacting with nearly 350 million consumers. ***In 2021, we expect to add another 50 million net new active accounts***.
>
> Equally important, our daily active users remain elevated versus a year ago, up 29% from Q4 of 2019. Our expanding scale and increasing engagement drove a record 4.4 billion transactions in the quarter, up 27%. Our total payment volumes in Q4 were $277 billion, up 36% on an FXN basis.

54. During the same call, Rainey stated:

> I'd now like to discuss our guidance for the full year and the first quarter. We've just completed the strongest year in our history, achieving record growth in net new accounts, volume, revenue, operating income, earnings and free cash flow. We delivered these results while absorbing meaningful macroeconomic headwinds affecting our credit business, the revenue and income effects of lower interest rates, idiosyncratic pressure on the travel and events verticals and the initial step down of volumes from eBay post operating agreement.
>
> These headwinds persist as we move into 2021, and yet, ***our core business continues to perform at unprecedented levels***. ***Our addressable opportunity has never been more expansive***, and we're confident we've never been better positioned to capture the benefits of this accelerated secular growth.

55. During the same call, in response to an analyst's question about the drivers of additional new accounts, Schulman stated:

> Yes. Yes, Darrin, I think when we look at the cohort of net new actives from last year, it's clearly incremental people coming on. The -- over 50 demographic, 50 years old demographic, one of our strongest growth vectors that we've had. So you're really seeing new demographics come onto the platform. But what's really interesting to me is the engagement metrics of that cohort are also up substantially. ***We have double-digit increases in value for net new actives. Our 90-day engagement rates are up 13% plus over traditional cohorts***.

56. During the same call, in response to an analyst's question about the drivers of additional of net new accounts, Schulman explained:

> But our TPA, which is a real measure of engagement, normalized basis would have grown 11.5%, like that's above any trend line that we have up to about 45.1x a year. ***And so our churn rates, in general, because of that, are coming down. And when you have a base as big as ours right now, it is as much, maybe even more about the churn rate than it is the new ads coming in***. ***There is plenty of demand to come on to our platform***.

> ***But when we see churn reduction like we're seeing right now because of increased engagement, and that increased engagement is coming because people are just moving online and because we have these new products that are out right now*** that people are just using a ton of more like crypto is a great example. Everyone who is signed on crypto is opening up their wallet app, 2x the level of what they did previous.
>
> ***And so I think that 50 million is a real good guide right now***. ***We'll obviously update as we go on***. ***But we're seeing a lot of really encouraging trends in the underlying cohorts that we're bringing on, which gives a lot of confidence to that 50 million number***.

57. During the Q&A portion of the call, in response to an analyst's question about PayPal's engagement and its aspirations of becoming a Super App, Schulman stated:

> So let me just very quickly say that ***we are seeing engagement levels already***. I talked about it. ***If you normalize for Honey and all the incremental net new actives that we brought in that are bending our traditional curves***. We've never really been above 9% or 10%. ***Normalized, we're at about 11.5% of growth***. Our churn rates are down. ***All of the new functionality that we've put into place, whether that be crypto or that be buy now, pay later, the Venmo card, QR codes are adding to usage***.

**2. February 5, 2021**

58. On February 5, 2021, PayPal to filed its 10-K for the fiscal year ended December 31, 2020. PayPal's 2020 10-K stated:

> ***P2P is a significant customer acquisition channel that facilitates organic growth*** by enabling potential PayPal users to establish active accounts with us at the time they make or receive a P2P payment.

**3. February 11, 2021**

59. On February 11, 2021, Schulman, Rainey, and Auerbach presented at PayPal's Investor Day. Schulman stated:

> And so the first thing that I would point out is, obviously, we've grown our scale substantially. We've gone from 180 or so million active accounts in 2015 to 377 million exiting 2020. This is the first time we're going to talk about a metric, but I'm very excited that ***over the next 5 years, we believe we can grow this 377 million to 750 million active accounts on our platform***.
>
> And the reason we feel so confident about that is that ***we are seeing engagement levels increase dramatically throughout our base especially with the new products that we've put out***. ***Over the past 5 years, we've seen engagement levels grow by 1.5x***. ***But given the success we've seen with the introduction of things like cryptocurrency, our off-line or in-store strategies, our buy now, pay later capabilities, we are seeing historic engagement curves start to bend and accelerate***.

And that's especially important because those do 2 things. One, they obviously increase the average revenue per user. And we expect that to grow substantially over the next 5 years. ***And at the same time, it also reduces our churn rate***. ***And as we get larger and larger, the more our churn rate reduces, the more our net new active cohorts can grow***.

60. Schulman continued:

First of all, the average revenue per user goes up quite dramatically over the next 5 years and our churn rate comes down. ***We are already seeing our churn rate come down quite meaningfully, for instance, in Q4 of last year***. ***And you think about that, when you're as big as we are, churn matters a time*** (sic). ***I mean, you reduce churn by 10, 20 basis points, you can reduce the number of people coming out of the bottom of the funnel by 5 million, 10 million, 15 million, 20 million***. ***And so as our churn starts to reduce and our engagement goes up, our cohorts start to go up as well, our net new active cohorts***. And so that's one place we'll get it.

61. Auerbach stated:

And third, ***we added roughly 73 million net new actives to PayPal in 12 months***. So we start 2021 with essentially 25% more customers than we started last year. ***And these new cohorts are using PayPal more than the old cohorts did, which is a remarkable accomplishment***. ***But it's not simply due to the pandemic***. ***We've gotten much better as a company in generating and engaging high-quality net new actives***. So yes, 2020 was a phenomenal year for us. Some of it was due to the great tailwinds we saw, but ***if we weren't really ready to capitalize on the massive shift to digital globally, you wouldn't be seeing the record number of product introductions, NNAs, customer engagement and volume coming on to our platform***.

62. Auerbach also stated:

***Fifth, we are much more programmatically driving new -- net new actives***. ***And this is not simply a factor of -- COVID-19 is not simply a factor of marketing***. ***We're getting much better at a company across PayPal through better user experiences, risk management, stronger ecosystem partnerships to drive NNAs on a sustainable basis***. And we're expanding our global reach in China, as we've talked about, in Japan, Mexico, Latin America. ***We expect to double our current base of consumers or customers in the next 3 to 5 years, which brings us much closer to the goal of getting to 1 billion consumers on to our network***. And as Jim and Peggy shared earlier, having this amazing, global network and combining it with a fantastic merchant proposition enables us to actually approach merchants and help them increase their sales just by working with PayPal. ***So what we're doing on the consumer side, together with what we're doing on the merchant side, we think it's going to bring us to 1 billion consumers on the network and 100 million merchants***.

4. **March 2, 2021**

63. On March 2, 2021, during trading hours, PayPal hosted a "Company Conference." During that Conference, in response to an analyst question about "getting to [the] 750 million" active user number, Rainey stated:

> Yes. Yes. ***Well, clearly, I think the plan that we laid out that doubles our customers over the next 5 years is something that we're very excited about***. ***And it really comes through multiple forms***.
>
> ***I'll start with one of the big efforts that we've made related to the increased engagement is to see a reduction in churn***. And so by extension of that, I mean some of the new customers that we're growing are where our core markets are today, where we have those customers. And so that's something that I think is going to drive or contribute to a lot of that growth.

5. **March 4, 2021**

64. On March 4, 2021, PayPal presented at the Evercore ISI's Payments and Fintech Innovators Forum. During that conference, in response to an analyst question about "the biggest drivers of net new account growth," Rainey stated:

> Sure. ***So we were excited to announce the plans over the next 5 years of doubling our net new actives***. ***And a significant driver of that is actually reducing the churn of the existing customers that we have***. In any given year, we do -- we have a significant customer, significant number of customers that churn. And part of the launching the new experiences of new products like buy now, pay later, crypto, getting into financial services, is to provide more means of engagement for that customer base so that they're interacting with us on a much more frequent basis, and then for -- more likely to use us in payments and not churn.
>
> ***So a big driver of that increase is reduced churn***. I guess, secondarily to that, we've got some plans to grow in particular international markets, which also includes expanding Venmo internationally. ***So those are probably the 2 big drivers of the net new active growth***.

6. **March 9, 2021**

65. On March 9, 2021, Schulman presented at the Wolfe Fintech Forum. During that conference, in response to an analyst question about user churn, engagement, and active user growth, Schulman stated:

> ***Well, when you're at 377-million-plus people on the platform, every basis point reduction in churn matters tremendously in terms of the number of net new actives that you can bring on to your platform***. ***Obviously, we've got relatively consistent and***

> ***even growing set of customers and merchants we want to come on to our platform at the top of the funnel***. I think we brought on something like 5.3 million merchants last year. That was up over 100% year-over-year.
>
> ***And so we've got new demographics, new markets, new products that are attracting new customers at the top of that funnel***. But to me, what's really important is that we close down the bottom of the funnel where people drop out. ***And there, there are a host of things that we're doing***. ***And I'm really very encouraged by the results that we're seeing in terms of engagement***. ***We've seen double-digit increases in our 2020 cohorts in terms of their customer lifetime value***. ***Our 90-day engagement rates for last year's cohorts are up 13%***. Our daily active users are consistently up about 30% year-over-year. And if you adjust our transactions per active for Honey, which we don't include but it's in our denominator, and if you adjust like the number of net new access last year was 73 million. Typically, we're putting on about 35 million. If you said last year, we had done 35 million, and you looked at our transactions, if you adjust for those 2 things, our TPA was up 11.5%. ***And so all of our kind of engagement curves are bending and accelerating***. And what I love is when they engage with our new products and services, like crypto, we are seeing people open the wallet 2x what they were previously our Buy Now, Pay Later, we're off to an incredibly rapid start there.
>
> ***But not only are we having all these first-time users coming on, but we're already seeing, like even in the first 3 months, like 40% reuse of Buy Now, Pay Later***. So -- and you've seen on things like in store, we have 50-plus incremental transactions when somebody starts using PayPal in store. ***And so when you combine all those things together and you see kind of the reduction in churn and the increase in average revenue per user, those are pretty encouraging when I look at over what that will do over the next 1, 3, 5 years***.

**7. <u>May 5, 2021</u>**

66. On May 5, 2021, after the market closed, PayPal reported its financial results on Form 8-K for 1Q2021. The 1Q2021 8-K stated:

> ***Q1'21 Strongest first quarter results in PayPal's history. . . Added 14.5 million Net New Accounts (NNAs); ended the quarter with 392 million active accounts***. ***FY'21: Raising NNAs, TPV, revenue, and earnings guidance . . . 52-55 million NNAs expected to be added in FY'21***.

67. PayPal attributed this to "***[s]ignificant customer growth and solid engagement . . . 14 million NNAs added, bringing total active accounts to 392 million, up 21%***."

68. The corresponding Investor Presentation stated:

> "Q1-21: Strongest Q1 in PayPal's History" and "+21% growth in active accounts to 329M; +14.5M net new actives (NNAs)" and "FY-21: Raising guidance on strong momentum . . . +52-55M NNAs expected in 2021; up from 50M at the start of 2021."

69. The following graphic was included in PayPal's corresponding Investor Presentation:




70. The following graphic was included in PayPal's corresponding Investor Presentation.



71. That same day, the Company hosted a conference call to discuss its quarterly results. During this call, Schulman stated:

> ***Our transactions in the quarter were approximately 4.4 billion, growing 34% year-over-year***. ***We added 14.5 million net new active accounts, ending the quarter with 392 million active accounts, up 21% year-over-year***. ***We added 1.4 million new merchants in the quarter, continuing the heightened pace from prior quarters***, and we now have 31 million merchant accounts on our platform. ***By the end of Q2, we expect to exceed 400 million active accounts***. ***And for the year, we now believe our NNAs will be between 52 million to 55 million, up from our previous expectations of approximately 50 million last quarter***. I'm particularly pleased to ***see our transactions per active account begin to accelerate due to increased engagement across our portfolio***.
>
> * * *
>
> ***We clearly have a lot of momentum as we exit Q1***. We will continue to accelerate new product innovation throughout the year. ***Our increased expectations for 2021 reflect our conviction that we will continue to grow share and increase our addressable market by capitalizing on the accelerating shift to digital***.

72. During that same call, Rainey stated:

> I'd also like to discuss our updated net new active outlook. We're raising our guidance for 2021 net new active accounts. ***Based on the 14.5 million additional accounts in Q1 and our current trends, we now expect to add in the range of 52 million to 55 million net new users this year***. This is an increase from the 50 million net new actives that we guided to start the year. ***On top of the approximately 73 million users added last year, at our current pace, we'll add more new users between last year and this year than we did in 2016, '17, '18 and '19 combined***.

73. During the Q&A portion of the conference call, in response to a question from an analyst, Schulman stated:

> ***And I think of the drivers, it's predominantly PayPal's, predominantly still in our core markets, still seeing great growth from Venmo***. ***But my view on net new actives is I say without being too aggressive here, look, I think we have a lot of opportunity yet here***. ***We have a lot of expansion into international markets***. ***I think our marketing programs are really beginning to deliver excellent results***. ***I think we're just scratching the surface there***.

74. During the Q&A portion of the conference call, in response to a question from an analyst, Schulman stated:

> ***And so we're clearly beginning to see both at the top of the funnel, the potential for increases into the top of the funnel and really narrowing the bottom of the funnel, which is why I'm bullish on -- actually our NNA trends***.

> The one thing I'd point out, Darrin, that I think is really important is the cadence of those NNAs. Q1 was a good solid quarter for us. Q2 is always going to be the lowest quarter of the year because we did 21.4 million net new actives last year. Even though our churn rates are down, and that was one of the best cohorts we ever activated, it puts incremental pressure at the bottom of the funnel for Q2. ***And then we see really increasing amounts of NNAs as we go through the year***. ***So in general, really strong on the NNA front, really strong on the engagement front***. And hopefully, more of that to come.

75. The Individual Defendants caused PayPal to file its Form 10-Q for 1Q2021, which stated:

> Transaction revenues grew by $1.4 billion, or 33%, for the three months ended March 31, 2021 compared to the same period of the prior year. ***The increase was mainly attributable to our core PayPal products and services, and to a lesser extent Braintree products and services, due primarily to strong growth in TPV and the number of payment transactions, both of which resulted primarily from an increase in our active accounts***.
>
> * * *
>
> ***We had 392 million active accounts as of March 31, 2021 compared to 325 million as of March 31, 2020, an increase of 21%***. ***Number of payment transactions were 4.4 billion for the three months ended March 31, 2021 compared to 3.3 billion in the three months ended March 31, 2020, an increase of 34%***. ***TPV was $285 billion for the three months ended March 31, 2021 compared to $191 billion in the three months ended March 31, 2020, an increase of 50%***.

**8. <u>May 10, 2021</u>**

76. On May 10, 2021, during trading hours, Schulman presented at Moffett Nathanson's Analyst call. During that call, in response to a question about PayPal's goal to achieve 750 million NNAs by 2025, Schulman stated:

> Yes. ***Well, we had another good Q1, 14.5 million new customers coming in***. We raised guidance for net new actives, up from 50 million to 52 million to 55 million. ***So we're clearly seeing more strength on that than we've imagined***. ***We're going to end the year somewhere around 430 million net new actives assuming we stay relatively constant, maybe grow a little bit next year***. ***I mean, you've got 0.5 billion people on the platform that's like within near-term [sight] and I think there are probably 3 or 4 things that give me a lot of confidence on the net new actives. And I think net actives will continue to grow year-over-year***.
>
> ***First of all, bottom of the funnel when you get to be closing in on 400 million net new actives, the bottom of the funnel, the churn is almost as important, if not more important than the top of the funnel***. ***And the new products we're putting out are having a pretty big impact on engagement***. ***In general, the move into a digital world***

> ***is helping our daily active users were up 33% in the quarter*. *So we're seeing our churn rate come down*. *And I think we're just at the very beginning of what we can see churn rate drop to*. *Obviously, the more products in services we put out more engagement, the more our churn will decrease*. *And even with a consistent level of top of the funnel, your net new actives will go up as a result*.**
>
> Second thing is, honestly, just streamlining the basics, and there's so much low-hanging fruit yet that we can do. Like our guest to member conversion flows, we have a ton of people that sign in guests but don't become members. That just needs to be a much smoother process for us. We can get a ton more net new actives by looking at that process. And of course, we are looking at that process. Our marketing programs are starting to kick in. ***Our marketing team is really beginning to get their rhythm in terms of just reactivations, life cycle management and a number of things that are basic things, but we've been doing a, I'd say okay to good job, but not a great job yet*. *And clearly, we've got great in our sights on that*.**

77. During that same call, an analyst asked the following question, to which Schulman responded as stated below:

> **Lisa Ann Dejong Ellis**: Actually, I had a quick follow-on on this topic, right off the bat out of the question list. So how do you highlight that -- starting to highlight now more of the top funnel versus the bottom of the funnel. So when you're thinking about investments, how do you think about balancing between new growth and retention?
>
> **Schulman**: Well, I think they kind of go hand-in-hand because a lot of our new growth will come from new products coming into the portfolio. And those help on the bottom line as well. So new product innovation is clearly, one of my top focuses that we have as a company. And you've seen from kind of our increase in marketing spend and OpEx, product development. We're clearly going to invest into the opportunity. There's so much potential for PayPal. ***We want to be 750 million, but everybody has heard me talk about -- our goal is to be 1 billion-plus users on our platform*. *You've got to invest into it*. *And we're quite measured in the way we think about investment*. *We've had very tight controls on OpEx, we still do*. *But when we see a real good ROI return, we're going to invest in it right now*. *And all of those numbers that we shared for our medium-term and short-term guidance contemplate significant investment in the business*.**

78. During that same call, Schulman explained:

> ***But if you think about it, we are also putting on a lot more net new actives than we've ever put on before*. *We're typically averaging about 35 million, 37 million a year*. *We're up at now somewhere between 52 million and 55 million*.**

**9. <u>May 24, 2021</u>**

79. On May 24, 2021, during trading hours, Rainey presented at J.P. Morgan's Payments and IT Services Sector analyst call. During that call, in response to an analyst question about the Company's increased NNAs, Rainey stated:

> Sure. ***Well, to start with, we're seeing increases in net new actives across all parts of our business***. ***And they skew heavily towards our core markets, U.S., Canada, U.K., Australia, Germany, markets like that***. ***But also in a lot of emerging regions as well***. ***The footprint of new users is relatively similar to what our existing footprint is***. ***And Venmo continues to be a very large contributor to that***. ***And certainly, as you see, the displacement of cash through enhanced P2P experiences, that's one of the best acquisition channels that we have for a new customer***.
>
> ***But we did put out a pretty grand target of 0.75 billion at our Investor Day***. ***And I think that's going to come through a number of different ways, but I think very importantly is reducing churn***. ***And very much tied to that is the increase in engagement that we expect to see from these new cohorts that are coming on***. ***And irrespective of what cohort we're talking about, post pandemic, we see much elevated levels of engagement***, whether we look at like 10-day adoption rates or 90-day adoption rates. And this is exciting for us. And I think it's in part because of this push to e-commerce or digital payments that happened in part by necessity when people did not have mobility. But as we've said, we're not just going to sit back and wait on these secular trends that happen to us. We want to help shape them. And that's why we're adding so many new experiences as we look forward through the digital wallet, and I'm sure we'll talk about some of those things to increase those levels of engagement and reduce that churn over time.

80. During that same call, Rainey stated:

> Yes. ***So our customer acquisition cost, historically, has been very low***. ***And that's in part because so many of our new customers come to us through the person-to-person type of experience***. ***And as we noted in the first quarter, that was still our single largest contributor to customer acquisition***. ***What we've done over the last, call it, 18 months is put much more rigor into the CLV component of that rather than chasing a low-value, net new active that maybe pumps up numbers and the optics look good, really looking at how they're going to contribute to the PayPal platform over time***. ***And so overall, our CAC, or customer acquisition costs still remains very low. But we've been more targeting in some of the sales and marketing efforts around that***.
>
> And so we noted in the back half of last year that we had intended to spend $300 million investing into PayPal, a lot of that through sales and marketing, and you likely saw that through some of the year-over-year increases. And some of that is targeted efforts around in-store QR code, things like that, but a lot of it is still around customer acquisition. ***And I'm always happy to spend money like this when I know what the return is going to be, and I've got a high degree of confidence in that***. ***And so we're doing a better job there in our sales and marketing teams is really going out and***

> ***acquiring those customers. And knowing what that return -- what that profile of customer is going to be over the next several years.***

81. During that same call, Rainey stated:

> It is. ***It's up there with engagement as one of the top metrics that I'm looking at, particularly engagement tied to some of the new experiences that we're rolling out.*** But historically, our average revenue per user has been in the mid-50s and not really bounced around a whole lot from that range. It is -- it's something that we're very focused on improving over the next several years. We talked at Investor Day, if we can get that mid- or medium-gauged consumer or customer to get to the high gauge, that's a 2x opportunity for us on ARPU. ***And so this very much dovetails into like rolling out these new experiences to get people more engaged with us so that we can have more opportunities for them to use us in a way that we can benefit and monetize.***

**10. <u>June 9, 2021</u>**

82. On June 9, 2021, during trading hours, Schulman presented at a Bank of America Securities keynote session. During that call, in response to an analyst question on PayPal's NNA metric, Schulman stated:

> Yes. Well, net new actives, it's a math equation. It's sort of top of the funnel, what is demand, new demand coming in minus churn, what's coming out of the bottom of the funnel. And clearly, as we get bigger and bigger -- we're 400 million-or-so people on the platform now. That's a pretty huge number, and so the bottom of the funnel is extremely important to manage.
>
> ***Look, demand -- we're seeing consistent demand for our services, maybe even growing demand. We put on, I think, 2 new customers every second last quarter.*** We put on a new merchant every 5 seconds last quarter. ***We're seeing new segments of the population.*** And man, silver tech, more of -- greater than 50 years old is still flocking to the platform. ***We're seeing more and more use of the platform. We're going into more and more countries.*** We'll expand Venmo internationally. I mean there's so many things we can do better at top of the funnel. ***Our marketing is finally starting to kick in, in ways that we can really measure and look at it, invest wisely and get a return on that and bring in high-quality net new actives at the top of the funnel.***
>
> In churn, churn is really all about how do we reduce that. It's really more about new products coming in, new use cases, beautiful experiences so that people want to use our platform not 4 times a month but every single day. That's clearly the goal that we have. And if we get anywhere close to that, our net new active numbers are going to increase dramatically from what already are, as you mentioned, pretty good numbers in terms of the NNAs.
>
> And I would say, as I look at the year, I'm feeling really good about the year. ***This quarter -- we've always had a forecast or target about 11 million or so. I think we'll be right around there and maybe a little bit above. We said we were going to be 52***

***million to 55 million for the year. I would bet that we're going to be closer to the high end of that range than we are to the low end of that range. And so I'm feeling really good about our progress on NNAs, our transactions per active going up really nicely, and I'd expect that to continue.***

**11. July 28, 2021**

83. On July 28, 2021, when the market closed, PayPal reported its financial results for 2Q2021. The corresponding Investor Update presentation included the following graphic:




84. The corresponding Investor Update presentation included the following graphic:



85. The corresponding Investor Update presentation included the following graphic:




86. The same day, after the market closed, the Company hosted a conference call to discuss its quarterly results. During that call, Schulman stated:

> Excluding eBay, our volumes grew by a remarkable 48% on a spot basis. ***Our active accounts now exceed 400 million, up 16% and to 403 million***. ***We added 11.4 million net new active accounts in the quarter***, including an additional 1.5 million merchant accounts. That brings our total merchant count to 32 million. ***We still expect to end the year at the higher end of our previous guidance of 52 million to 55 million net new active accounts***.
>
> Transactions in the quarter grew by 27% to $4.74 billion. ***And even as our net new actives continue to show strong growth, our transactions per active account accelerated 11% in the quarter to 43.5x as our consumers engage more frequently across our growing suite of services***. We grew our revenues by 19% to $6.4 billion. This growth comes even as we lap strong results from last year and absorbed 811 basis points of revenue pressure from eBay, as their revenues on our platform declined 51% in Q2.

87. During that same call, Rainey stated:

> I'd now like to discuss our outlook for the rest of 2021. ***Our business is performing exceedingly well and overall, consistent with the outlook we provided on our last call***. ***Given our strong year-to-date performance and our expectations for the back half, we're raising our TPV outlook and reiterating full year revenue and earnings***. ***We***

> ***now expect TPV growth to be in the range of 33% to 35% given the strong volume trends in our business.***
>
> * * *
>
> ***Overall, our growth remains strong***. And importantly, we continue to see the categories that benefited from quarantine measures and shelter-in-place activities last year maintain higher levels of e-commerce volumes in comparison to pre-COVID levels. Our conviction and our ability to drive sustainably strong performance and in the strength of our franchise has never been greater.
>
> ***This year, we expect to process approximately $1.25 trillion of payments volume***. ***We expect to grow revenue by 20%, more than offsetting pressure to revenue growth of approximately 7 points from eBay and lapping our strongest year with 22% revenue growth***. And given the momentum we have in development and innovation, and the pace of scale of the new experiences we're bringing to our customers, we are investing in our business at record levels. Further, last year, we grew earnings 31%. On top of that performance, this year, we plan to grow our earnings by 21%.

88. The same day, The Individual Defendants caused PayPal to file its Form 10-Q for 2Q2021, which stated:

> Transaction revenues grew by $852 million, or 17%, and $2.3 billion, or 25%, for the three and six months ended June 30, 2021, respectively, compared to the same periods of the prior year. ***The growth in transaction revenues was mainly attributable to our core PayPal and Braintree products and services driven by strong growth in TPV and the number of payment transactions, both of which resulted primarily from an increase in our active accounts***.
>
> * * *
>
> ***We had 403 million active accounts as of June 30, 2021 compared to 346 million as of June 30, 2020, an increase of 16%***. Number of payment transactions were 4.7 billion for the three months ended June 30, 2021 compared to 3.7 billion in the three months ended June 30, 2020, an increase of 27%. Number of payment transactions were 9.1 billion for the six months ended June 30, 2021 compared to 7.0 billion in the six months ended June 30, 2020, an increase of 30%. ***TPV was $311 billion for the three months ended June 30, 2021 compared to $222 billion in the three months ended June 30, 2020, an increase of 40%***. ***TPV was $596 billion for the six months ended June 30, 2021 compared to $412 billion in the six months ended June 30, 2020, an increase of 45%***.

**12. <u>September 9, 2021</u>**

89. On September 9, 2021, during trading hours, Rainey presented at a Deutsche Bank fireside chat. In response to an analyst question on how PayPal will achieve its $750 million NNA target over the next four years, Rainey stated:

> Well, I think it's important to step back and think about the composition of net new actives. And so net new actives is a function of 3 things. It's new activations plus reactivations, and then we subtract up churn and improving a lot of focus on new activations. And we saw that during the height of the shelter-in-place during COVID early last year.
>
> ***But a lot of our focus, a lot of our rigor, the data science that we provide around this is around reactivations and churn***. Reactivations are actually a great opportunity for us because we already have that customer's payment credentials vaulted with us. And so there's a lot less friction in reactivating the customer versus activating a new customer.
>
> On the churn side, look, it's not something that we disclose, but you can make your own assumption. With 400 million customers around the world, the churn numbers can be pretty large each year. ***And so a lot of the focus that we have, not only this year but going forward, is to keep those customers engaged and allow them to use us in many different ways, many avenues that they haven't before to diminish that chance for churn***.
>
> ***And so as we look forward over the coming years, as we add capabilities into the digital wallet, things like crypto, things like investing, buy now, pay later, all of these things are key drivers that increase in engagement and therefore, decrease churn***.

**13. <u>September 23, 2021</u>**

90. On September 23, 2021, during trading hours, Schulman presented at J.P. Morgan's All Stars Conference. During this conference, Schulman stated:

> Yes. Look, we gave guidance for the quarter. ***I think we'll be right down the middle of the fairway in all the guidance that we talked about***. ***Things are coming in pretty much where we expected them to be for the quarter***. And so my view is the world move towards digital.

**14. <u>November 8, 2021</u>**

91. On November 8, 2021, when the market closed, PayPal reported its financial results on Form 8-K for 3Q2021. The corresponding Investor Update presentation included the following graphic:




92. The same day, after the market closed, the Company hosted a conference call to discuss its quarterly results. During this call, Schulman stated:

> ***Our active accounts were up 15% year-over-year, reaching 416 million. We added 13.3 million net new active accounts in the quarter, including another 1.2 million merchant accounts, bringing our total merchant count to 33 million. And we remain on track to deliver more than 52 million NNAs for the year. Importantly, our diverse suite of products and services drove double-digit growth in our transactions per active account, up 10% to 44.2x.***

93. The corresponding Investor Update presentation included the following graphic:

## FY-21 Guidance

### Revenue expected to grow ~18% and end the year with >430M active accounts

| | |
|---|---|
| Net Revenue ($B) | $25.3-$25.4 |
| Net Revenue Growth (Spot) | ~18% |
| Non-GAAP EPS Growth | ~19% |
| Free Cash Flow ($B) | ~$5.2 |

*Percentages shown are year-on-year growth rates*

- Non-GAAP effective tax rate of ~12%
- Capex of ~4% of revenue
- GAAP EPS of ~$3.62

- **NNAs:** Expect to add ~55 million NNAs in FY-21, including ~3 million active accounts added from the acquisition of Paidy
- **TPV:** Expect TPV growth to be in the range of ~33%-34% on a spot and ~31%-32% FXN basis
  - Excluding eBay, TPV expected to grow ~39%
- **Revenue:** Expect revenue growth of ~18% at spot and ~17% FXN, which includes eBay revenue decline of ~$1.4B
  - Excluding eBay, revenue expected to grow ~28%
- **Non-GAAP Operating Margin:** Expect in-line with prior year
- **EPS:** Expect non-GAAP EPS growth of ~19% to ~$4.60
  - GAAP EPS guidance includes a net gain of ~$0.24 on PayPal's strategic investment portfolio
  - In 2020, GAAP EPS included a net gain of ~$1.24 on PayPal's strategic investment portfolio

Non-GAAP EPS, non-GAAP operating margin and free cash flow are non-GAAP financial measures. Please see the Supplemental Information for a reconciliation of these non-GAAP financial measures to the most directly comparable GAAP financial measures.

PayPal ©2021 PayPal Holdings Inc. Q3-21 Investor Update • 24

94. During the same call, CFO-Rainey stated:

> To give you a better sense of the scale of growth we've experienced, it took 20 years for PayPal to reach $600 billion in annual payment volume, which occurred in 2019. Only 2 years later, we crossed $1.2 trillion. ***Relative to 2019, we've seen significant growth across our key performance indicators, including active accounts, engagement, TPV, revenue, EPS and free cash flow***.

95. During the same call, Rainey stated:

> ***In providing quarterly and annual guidance since July of last year, our goal has been to responsibly balance transparency with reliability and certainty***. At the same time, we've also tried to emphasize the complexity of forecasting in this environment. We are taking what we view to be a prudent step in adjusting our outlook. ***But let me be very clear, our key strategic initiatives are on track and performing very well***. ***The initial response to our new digital wallet experiences has been very strong,*** and the implementation of our new headline pricing in the U.S. has been successful with no discernible impact to merchant activity.
>
> The underlying strength, diversification and resilience of our business on an absolute level and relative to pre-pandemic are unassailable and position us to remain on offense regardless of short-term headwinds. ***Our ability to sustainably deliver strong growth at our scale is indicative of the network effects of our business and our competitive positioning as a global leader in digital payments at the intersection of the powerful secular tailwinds of e-commerce penetration and cash displacement has never been stronger***.

96. During the same call, Schulman stated:

> Well, let me talk a little bit about NNAs. ***So 13.3 million in the quarter, up about 2 million from last quarter, growing 15% year-over-year, unlike a lot of companies that experienced growth in the off time and then are unwinding***.
>
> ***Our growth remains incredibly strong on the NNA side***. I mean, think about it in the minute that we've been talking so far, Darren. ***We've got -- we put on about 100 consumers and 9 new merchants***. ***We are putting on 1.5 consumers every second of the quarter, every 6 seconds we put on another merchant***. It's really unbelievable. And if I look 5 years ago, and you remember this, 5 years ago, we put on 13 million net new actives for the year. ***This quarter alone, and we put on 110 million net new actives since January of 2020***. ***And as we said, I think, in our press release, we expect to end the year north of 430 million actives on the platform. So obviously, continued strong growth***.

97. During the same call, Schulman stated:

> But as we look forward to that []750 million, Darren, there are 2 places that our net new actives come from. One is top of the funnel, and top of the funnel is actually pretty strong right now and remain so. It's a kind of a must-have platform for merchants and consumers, and scale begets scale in this business. But as you get bigger and bigger, the bottom of the funnel becomes equally -- it's not even more important. ***And so reduction in churn becomes a really important element of our ability to get to the 750 million***. ***That's why we're so excited about what we're seeing in terms of our TPA numbers, again, normalize it ex-eBay, up 18%. Last quarter, I think it was up 17%, double-digit growth even with eBay***.
>
> ***And at 2 quarters in a row, some of the things I was talking to Lisa about in terms of the engagement on the app, those are things that the more people engaged, the more people get cash cards utilizing that service offline***. ***We see halo effects inside the business***. Buy Now, Pay Later, all of that actually affects churn rate. And if we can keep a consistent top of the funnel, maybe even improve that a little bit, but reduce our churn rate, you'll start to see net new actives actually accelerate going forward. ***And so we remain still quite confident in the 750 million, but that's what the drivers are of that, Darren***.

98. On November 9, 2021, the Company hosted a related buyside analyst call, on which, in response to an analyst question on NNAs, Rainey stated:

> Well, this answer is going to be similar to my last one in so far as, as we sit here today, and we go back to the beginning and compare to the beginning of the year. ***Our net new actives are going to do better than what we originally expected on an organic basis***. S***o, I'm excluding Paidy from that***. ***So, we perform very well there***. Again, we've seen strong correlation with shelter in place or locked down and net new active trends on the top of the funnel. And so that's driven some of the results over the last year and a half. And so, as we were sitting there in the first quarter with an expectation that some of that

would persist longer than it actually has, that caused us to increase our guidance around that new actives.

***[Low quality new actives] is not something that we want to chase as a company, and we can certainly go out and spend money on customer acquisition and get very low value net new actives to inflate or pump up that number, but that's not the right economic decision for us longer term. And I've got confidence in where we are longer term around net new actives. We consistently put out aggressive numbers. I think this is one that falls into that category, but historically we've done a pretty good job of achieving that performance***. As we look forward over the next several years, more of that growth is going to come through retention of the bottom of the funnel, where we focus a lot on our churn metrics. And as we have experiences that improve engagement, that will certainly help there. And then international expansion is another one that, I think has a real opportunity for us to increase that number over the next few years.

99. On November 9, 2021, after the market closed, The Individual Defendants caused PayPal to file its Form 10-Q for 3Q2021, which stated:

Three months ended September 30, 2021, and 2020:

***Net revenues increased $723 million, or 13%, in the three months ended September 30, 2021 compared to the same period of the prior year driven primarily by growth in total payment volume ("TPV", as defined below under "Net Revenues") of 26%***.

* * *

Nine months ended September 30, 2021, and 2020:

Net revenues increased $3.1 billion, or 20%, in the nine months ended September 30, 2021 compared to the same period of the prior year ***driven primarily by growth in TPV of 38%***.

* * *

***We had 416 million active accounts as of September 30, 2021 compared to 361 million as of September 30, 2020, an increase of 15%***. Number of payment transactions were 4.9 billion for the three months ended September 30, 2021 compared to 4.0 billion in the three months ended September 30, 2020, an increase of 22%. Number of payment transactions were 14.0 billion for the nine months ended September 30, 2021 compared to 11.0 billion in the nine months ended September 30, 2020, an increase of 27%. TPV was $310 billion for the three months ended September 30, 2021 compared to $247 billion in the three months ended September 30, 2020, an increase of 26%. TPV was $906 billion for the nine months ended September 30, 2021 compared to $659 billion in the nine months ended September 30, 2020, an increase of 38%.

Transaction revenues grew more slowly than TPV and number of payment transactions for the three and nine months ended September 30, 2021 compared to the same periods in the prior year due primarily to a decline in eBay's marketplace platform TPV with

> higher rates, a higher portion of TPV generated by platform partners, large merchants, and other marketplaces who generally pay lower rates with higher transaction volumes, and an unfavorable impact from hedging. Changes in prices charged to our customers did not significantly impact transaction revenue growth for the three and nine months ended September 30, 2021.

**15. <u>November 30, 2021</u>**

100. On November 30, 2021, after the market closed, Schulman participated in an interview on Mad Money with Jim Cramer. During that interview, in response to a question about PayPal's goal of 750 million users by 2025, Schulman stated:

> So this year what we told the market is we do about 55 million net new actives and ***we're on track to do 55 million net new actives***. Um, I would say the way to think about this, Jim, is there are two ways of thinking about net new actives. One is the top of the funnel. How many new are you getting? ***And then there's the bottom of the funnel because today we're over 416 million people on the platform today***. ***We'll wind up the year north of 430 million, uh, on the platform***. So the key to stopping people from leaving the platform is engagement, right? And engagement has to do with expanding our value proposition into new applications. Like for instance, buy now, pay later, which we should talk about later because that's been one of the stars actually of the holiday season for us.

**16. <u>December 7, 2021</u>**

101. On December 7, 2021, during trading hours, Schulman presented on a Goldman Sachs conference call. During that call, in response to an analyst question about what accelerates the growth of PayPal's platform, Schulman stated:

> ***We're actually putting on 110 million net new actives in 7 quarters, so January 2020 to end of last quarter***. And if you look at other metrics, I think it took us 20 years to get to $600 billion of TPV going through the platform. So here we are 2 years later, and I think we'll do somewhere around $1.25 trillion through the platform, so doubled in 2 years.
>
> * * *
>
> ***Like today, probably not many people realize this, when you do a transaction on PayPal, we look obviously at your username and your password***. ***But that's kind of "jacks-or-better" to sort of like open sort things***. ***We look at 200-plus different indicators to decide instantaneously is it you or not***. We don't need username and password. Eventually, that will probably go away to take a lot of friction out of the system, and we'll use all the different data points we have to create a frictionless checkout experience. Right now, our checkout, as best we can tell, is about 34% more efficient than anyone else's checkout.

**D. <u>The Foregoing Statements Were False And Misleading</u>**

102. The above statements were false and misleading when made because these statements failed to disclose: (i) the majority of PayPal's Total Payment Volume or "TPV" was heavily concentrated in a minority of accounts and was not meaningfully impacted by Net New Active accounts or NNAs; and (ii) a significant portion of the Company's NNAs were "illegitimate" or "minimally engaged."

103. Since the majority of PayPal's TPV was concentrated in about one-third of its users, the above statements concerning TPV created the misleading impression NNAs were engaged and drove transaction volume. The Individual Defendants were aware of this increased concentration of transaction volume in a relatively small number of accounts through their internal monitoring of PayPal's transactions.

104. The Individual Defendants, particularly Rainey and Schulman, were aware of the risks associated with the promotions they had chosen to implement to drive NNA growth. One of the main risks communicated to the Individual Defendants, including Rainey and Schulman, was the possibility of illegitimate accounts created purely to exploit these promotions. However, the Individual Defendants never disclosed these risks, or the fact these risks had materialized, thus creating the impression the Company's NNA numbers reflected organic, engaged users, which was not the case.

**E. <u>The Truth Is Fully Revealed</u>**

105. At market close on February 1, 2022, PayPal released its 4Q2021 results and held two corresponding analyst calls — one the same day and another on February 2, 2022. During the calls, the Individual Defendants disclosed that PayPal's position was far weaker than previously stated, because PayPal had counted "illegitimate" accounts as part of its publicly reported NNA figures and the vast majority of even the legitimate accounts that PayPal had generated in 2021 were essentially unengaged with the platform, casting serious doubts about PayPal's growth prospects.

106. When releasing its 3Q2021 results on November 8, 2021, the Individual Defendants had said PayPal would generate 55 million NNAs in FY 2021. Because the results for the first three quarters of 2021 were reported at the time of that guidance — showing 39.2 million NNAs — this

meant PayPal was guiding that it would have NNA of 15.8 million in 4Q2021. The "street" expectation — *i.e.*, the general reported sentiment among analysts — was that PayPal would produce 15 million NNAs in the fourth quarter. However, the guidance given with the 3Q2021 results explicitly stated that 3 million of the 4Q2021 NNAs would be derived from PayPal's recent acquisition of the company Paidy, meaning that "organic" NNA guidance was really only 12.8 million.

107. In delivering the 4Q2021 results, PayPal revealed total NNA numbers of 9.8 million, including the 3.2 million accounts coming from Paidy. This meant that in reality PayPal had only generated 6.6 million organic NNAs against organic guidance of 12.8 million, meaning ***PayPal missed organic NNA guidance by a whopping 48.4%.***

108. In addition, on PayPal's February 1, 2022, earnings call for FY 2022, Rainey revealed that PayPal had previously counted a large number of "accounts that [] were illegitimately created" in its previously reported NNA results. Specifically, Rainey revealed that PayPal had included these illegitimate accounts in its 1Q2021, 2Q2021, and 3Q2021 results, and most astoundingly its 3Q2021 year to date NNA figures included at least 4.5 million of these "illegitimate" accounts. Rainey also revealed that illegitimate accounts were also created in 4Q2021 but were not included in the published results. Thus, as Rainey explained, excluding the previously counted illegitimate accounts (essentially restating the prior results) "affected [PayPal's] ability to achieve [its] guidance in the quarter."

109. In PayPal's February 2, 2022, buy side analyst call, J.P. Morgan analyst Tien-Tsin Huang stated that he had "a lot of questions" about the illegitimate accounts, and asked PayPal to clarify the issue, noting "it feels like that's the bulk of what drove the difference in NNAs." Rainey confirmed that the illegitimate accounts were the "primary driver of the miss." Rainey then stated: "we're constantly assessing the legitimacy of new accounts that are created," admitting that he and PayPal's other executives were "constantly" assessing the issue and thus knew or were reckless in not knowing of the illegitimate accounts when reporting results and guidance earlier in the year. Rainey then confirmed that the issue arose due to "bots" creating "multiple accounts to avail themselves" of PayPal's incentive campaigns.

110. In addition to this startling revelation concerning the previously counted illegitimate accounts, PayPal also revealed deeply troubling new information concerning its user engagement and composition. PayPal had long touted its user growth as a major selling point, on the basis that continued acquisition of NNAs would both (1) drive TPV (and correspondingly drive earnings for PayPal) and (2) provide a compelling user base that PayPal could leverage in its Super App ambitions. However, in the February 1, 2022, 4Q2021 earnings call, Rainey revealed that PayPal's user base had actually become replete with "minimally engaged" users, and that the "vast majority" of PayPal's volume comes "from about 1/3 of our customer base."

111. Rainey explicitly connected this trend to PayPal's aggressive marketing practices — the same NNA promotional practices that had led to the creation of over 4.5 million illegitimate accounts — by stating that:

> (a) PayPal "leaned into incentivized customer acquisition tactics to a much greater extent than we ever have in our history;"
>
> (b) PayPal monitored the effectiveness of these campaigns — specifically by looking at "the impact on customer behavior in the months that follow account creation" and the "ROI or return on that [promotional] investment spend from their expected contribution to TPV, revenue and operating income;"
>
> (c) As a result of that monitoring, PayPal knew that while its promotional campaigns were "successful at generating account creation," the customers being added to the user base had "lower engagement and a higher propensity to churn."

112. Similarly, Schulman admitted that PayPal had known about the low engagement issue, had even designed incentive programs in response to that issue, and had found the users PayPal had been pulling in based on the promotions "would do one transaction and then fall dormant." In other words, defendants Schulman, Rainey, and Auerbach had long understood the Company's 2021 NNA growth was fictitious and these supposedly "active" accounts, merely harvested PayPal's promotion money without any additional activity. Schulman conceded that these accounts did "nothing for our revenue growth".

113. These revelations suggest defendants Schulman, Rainey, and Auerbach were deceiving not just public shareholders, but the Board as well. Additionally, the Securities Class Action alleges, through confidential witnesses, defendants Schulman, Rainey, and Auerbach were

aware of the issues with their online engagement campaigns and the resulting illegitimate accounts. For example, the Securities Class Action alleges NNAs were closely monitored by the Company:

> CW-1 explained that the NNA metric was so important, that PayPal had assembled a team of individuals from throughout the Company to attend weekly NNA Rally meetings, to discuss NNA growth, and stated that the assembly of this sort of team was unusual for PayPal, but undertaken given the "tremendous" leadership demand for growing NNAs. That NNA Rally team reported to PayPal's SLT, which included Defendant Schulman, Defendant Rainey, Defendant Auerbach, Chief Marketing Officer Leanne Sheraton, Executive Vice President, Global Sales Peggy Alford, Executive Vice President and Chief Enterprise Services Officer Aaron Karczmer, Chief Risk and Compliance Officer Fiachre O'Neil, and Executive Vice President and Chief Product Officer Mark Britto.

The Amended Complaint at ¶348.

114. The Amended Complaint further alleges:

> CW-2, a former Director in the finance organization at PayPal, explained that the NNA metrics were measured daily and that an automated daily report was generated and sent to PayPal's C-suite, which tracked gross new additions, churn, and activity by cohort. CW-2 also recalled the "big push" in 2021 to pursue NNA growth. Similarly, CW-3 also recalled a "heavy" push on NNAs at all costs . . . .

*Id.* at ¶349.

115. These allegations suggest defendants Schulman, Rainey, and Auerbach were aware of the problem well in advance of their disclosure of these illegitimate accounts to the Board in January 2021 discussed above. While the numbers reported to the Board and public shareholders were the same throughout the relevant period, Stockholder alleges the Individual Defendants knew these numbers were inaccurate when they reported them to the Board.

**F. <u>Insider Trading</u>**

116. Additionally, the Individual Defendants schemed to take advantage of the Company's stock price by selling significant amounts of stock during the above periods, particularly between February 3, 2021, and March 10, 2021. The statements made during this time, in addition to the issues detailed above, were false and misleading because the information presented to the public significantly differed from the information presented to the Board.

117. These trades we made near times defendants made false and misleading statements. Further, several of the trades were for significant percentages of the sellers' overall holdings. For

example, defendants Rainey and Pentland both sold over 50% of their holdings on March 3, 2021. Lastly, as noted below, the Individual Defendants' trades slowed substantially after the end of the first quarter of 2021.

118. The statements made on February 3, 2021, were false and misleading when made because they misrepresented the expected number of NNA accounts PayPal expected to add by a material amount. The Individual Defendants knew that the Company only expected to add 40 million NNA accounts, not 50 million.

119. The statements made on February 11, 2021, March 2, 2021, and March 4, 2021, were false and misleading when made because they misrepresent the Company's expected churn rate, which the Individual Defendants knew would increase during Q2 of 2021.

120. The statements made on March 9, 2021, were false and misleading because they misrepresent the Company's churn rate and user's engagement levels.

121. While making the above false statements, the Individual Defendants unloaded over $60 million in stock combined as detailed in the below tables:

1. Schulman

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| Feb. 5, 2021 | 10,000 | $267.67 | $2,677,626 |
| Feb. 16, 2021 | 10,000 | $304.32 | $3,043,239 |
| Mar. 10, 2021 | 10,000 | $244.29 | $2,442,876 |
| | | **TOTAL PROCEEDS:** | **$8,163,741** |

2. Rainey

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| Feb. 17, 2021 | 5,377 | $298.00 | $1,602,346 |
| Mar. 3, 2021 | 73,758 | $261.18 | $19,264,378 |
| | | **TOTAL PROCEEDS:** | **$20,866,724** |

3. Auerbach

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| Feb. 23, 2021 | 46,134 | $261.38 | $12,058,533 |
| | | **TOTAL PROCEEDS:** | **$12,058,533** |

4. Sarnoff

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| Feb. 16, 2021 | 5,290 | $303.49 | $1,605,462 |
| | | **TOTAL PROCEEDS:** | **$1,605,462** |

5. Pentland

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| Mar. 3, 2021 | 73,758 | $261.18 | $19,264,378 |
| | | **TOTAL PROCEEDS:** | **$19,264,378** |

122. After the first quarter of 2021, trades slowed down and only Schulman and Auerbach made trades during this time and are detailed in the tables below:

6. Schulman

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| May 3, 2021 | 10,000 | $263.11 | $2,631,074 |
| May 19, 2021 | 10,000 | $245.55 | $2,455,538 |
| June 11, 2021 | 10,000 | $267.77 | $2,677,672 |
| Aug. 2, 2021 | 10,000 | $276.81 | $2,768,092 |
| Aug. 13, 2021 | 10,000 | $275.23 | $2,752,326 |
| Sep. 13, 2021 | 10,000 | $285.93 | $2,859,324 |
| Nov. 1, 2021 | 10,000 | $234.53 | $2,345,288 |
| Nov. 15, 2021 | 10,000 | $206.38 | $2,063,792 |

| | | | |
|---|---|---|---|
| Dec. 13, 2021 | 10,000 | $188.81 | $1,888,094 |
| | | **TOTAL PROCEEDS:** | **$22,441,200** |

7. Auerbach

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| May 26, 2021 | 14,242 | $258.92 | $3,687,513 |
| Aug. 25, 2021 | 12,314 | $278.64 | $3,431,208 |
| Nov. 23, 2021 | 12,314 | $204.42 | $2,306,689 |
| | | **TOTAL PROCEEDS:** | **$9,425,410** |

123. Each of the above trades was made while in possession of material, adverse, non-public information. Thus, each sale was a violation of the seller's fiduciary duties.

## V. DUTIES OF THE INDIVIDUAL DEFENDANTS

### A. Defendants' Fiduciary Duties

124. By reason of their positions as officers, directors and/or fiduciaries of PayPal, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe, the Company and its shareholders the fiduciary duties of care and loyalty, including the subsidiary duties of good faith, oversight, and disclosure, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

125. Each director and officer of the Company owed, and owes, to PayPal and its shareholders fiduciary duties of due care, loyalty, and good faith in the administration of the affairs of the Company and in the use and preservation of its property and assets. The duty of care requires informed, deliberative decision-making based on all material information reasonably available. The duty of loyalty requires acting (including deciding not to act) on a disinterested and independent

basis, in good faith, with an honest belief that the action is in the best interests of the Company and its shareholders.

126. Each director and officer of the Company is required to act in furtherance of the best interests of PayPal and its shareholders to benefit all of the Company's shareholders equally, and not in furtherance of their personal interest or benefit.

127. The Individual Defendants, because of their positions of control and authority as directors and/or officers of PayPal, were able to, and did, directly and indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had knowledge of material, non-public information regarding the Company. As senior officers and directors of a publicly held company whose stock was registered with the SEC under the Exchange Act and publicly traded, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

128. At all times relevant hereto, the Individual Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency. Each of the Individual Defendants' conduct—who were officers and directors of the Company—was ratified by the remaining Individual Defendants who collectively comprised the Company's board of directors at all relevant times herein.

129. To discharge their fiduciary duties, the officers and directors of PayPal were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

a. exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner, so as to make it possible to provide the highest quality performance of their business;

b. exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and in compliance with all applicable federal and state laws,

rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c. when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence;

d. remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

e. establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

f. exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

g. refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h. examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

**B. <u>Control, Access, And Authority</u>**

130. The Individual Defendants, because of their positions of control and authority as directors and/or officers of PayPal, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of and alleged herein, as well as the contents of the various public statements issued by PayPal.

131. Because of their advisory, executive, managerial, and directorial positions with PayPal, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of PayPal.

132. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of PayPal and was at all times acting within the course and scope of such agency.

**C. <u>Reasonable And Prudent Supervision</u>**

133. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

a. ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

b. conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c. properly and accurately guide investors and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

d. remain informed as to how PayPal conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws;

e. refrain from trading on material, adverse, non-public information; and

f. ensure that PayPal was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## VI. BREACHES OF DUTIES

134. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to PayPal and its shareholders the fiduciary duty of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of PayPal, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of PayPal, the absence of good faith on their part, and a reckless disregard for their duties to PayPal and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to PayPal.

135. The Individual Defendants each breached their duty of loyalty, including the subsidiary duties of good faith, oversight and disclosure, by issuing, or causing the Company to issue, false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

## VII. DAMAGES TO PAYPAL

136. As a result of the Individual Defendants' wrongful conduct, PayPal disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated PayPal's credibility. PayPal has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

137. Further, as a direct and proximate result of the Defendants' conduct, PayPal has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

a. costs incurred in investigating and defending PayPal and certain officers in the Securities Class Action;

b. costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based, at least in part, on the Company's artificially inflated stock price; and

c. costs incurred from the loss of the Company's customers' confidence in PayPal and its products.

138. Moreover, these actions have irreparably damaged the Company's corporate image and goodwill. For at least the foreseeable future, PayPal will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VIII. DERIVATIVE AND DEMAND ALLEGATIONS

139. Plaintiff brings this action derivatively in the right and for the benefit of PayPal to redress injuries suffered, and to be suffered, by PayPal, as a direct result of the Individual Defendants' wrongdoing as alleged herein. PayPal is named as a nominal defendant solely in a derivative capacity.

140. Plaintiff will adequately and fairly represent the interests of PayPal in enforcing and prosecuting the Company's rights.

141. Plaintiff is, and has continuously been, a shareholder of PayPal since prior to the start of the relevant period, and has been a shareholder at all relevant times, including at the time of the Individual Defendants' wrongdoing complained of herein.

142. As detailed below, Plaintiff's pre-suit Demand has been wrongfully ignored by the Board, forcing Plaintiff to file this shareholder derivative action on behalf of the Company.

143. Given the Board's wrongful, bad-faith, and unreasonable failure to respond to Plaintiff's lawful Demand to sufficiently investigate the misconduct, and/or to take sufficient action to remedy the harms caused to the Company, this shareholder derivative action should be permitted to proceed.

**A. Plaintiff's Demand Allegations**

144. Plaintiff made his formal demand for litigation (the "Demand") on July 31, 2024, where he demanded the Board: (i) undertake (or cause to be undertaken) an independent, internal investigation into the Individual Defendants' violations of Delaware and federal law; and (ii) commence a civil action against the Individual Defendants (and any other director, officer, or employee who may be similarly liable for breaches of fiduciary duty, aiding and abetting the Individual Defendants' breaches of fiduciary duty, contribution, and indemnification against the Individual Defendants) to recover for the benefit of the Company the amount damages sustained by the Company as a result of their breaches of fiduciary duty alleged herein, as well as take additional affirmative steps to redress the wrongs described herein and prevent such wrongdoing from occurring again in the future.

145. The Demand described how the Individual Defendants violated their fiduciary duties during the relevant period through their wrongful conduct described above. To redress these wrongs, and prevent such wrongdoing in the future, Plaintiff demanded:

a. The Board should require the Company's executives and directors, and any other persons or entities, account to the Company for all damages sustained, or to be sustained, by the Company caused by the wrongs and misconduct complained of herein.

b. The Board should make certain that no Company funds are used towards any settlement or resolution of the Securities Class Action, among any other related litigation.

c. The Board should require the Company's officers and directors to return to PayPal all salaries, bonuses, severance, and the value of any other remuneration, of whatever form paid to them by the Company, during the time they were in breach of the fiduciary duties owed to PayPal.

d. The Board should require the disgorgement of all profits realized as a result of the illicit insider sales described herein.

e. The Board shall terminate, for cause, any Company employee responsible for the wrongdoing alleged herein and, to the extent an officer or director is found to have engaged in wrongdoing, such officer or director of the Company shall immediately be removed from his or her respective position at the Company and/or on the Board for cause.

f. The Board should require that the Executives and Directors pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of their culpable conduct.

g. The Board should adopt corporate governance reforms to ensure that the improper and illegal conduct complained of herein will not occur in the future, including, inter alia, reforms to the Company's internal controls and disclosure controls and procedures, conflicts of interest and corporate opportunity policies and procedures, insider selling controls and procedures, and compliance with legal and regulatory requirements.

146. On August 16, 2024, James Lindfelt, the Company's Director of Global Litigation, sent an email to Plaintiff's counsel acknowledging the receipt of the Demand and informing Plaintiff the Board would consider the Demand at its next regularly scheduled meeting.

147. On September 7, 2024, Plaintiff's counsel sent a follow-up letter to Mr. Lindfelt urging the Board to undertake an investigation into the Demand's allegations and requesting certain information related to said investigation.

148. On November 19, 2024, Plaintiff's counsel sent a letter to the Board's counsel memorializing the conversation which had taken place earlier the same day. Particularly, Plaintiff's counsel emphasized the Board's should seek a tolling agreement with Pentland to preserve the Company's valuable claims against him.

149. On December 9, 2024, Plaintiff's counsel sent a letter to the Board's counsel providing additional information as to why the Board's reasonings for not seeking a tolling agreement with Pentland (*i.e.* her lack of access to information about NNAs, her lack of a business role, her being an attorney, and that she was no longer employed at PayPal) were insufficient.

Further, Plaintiff's counsel provided detailed information concerning Pentland's possible liability for the misappropriation of material, non-public information under *Brophy*.

150. The Board has yet to respond to the December 9, 2024, letter and has not provided confirmation it will seek a tolling agreement with Pentland or has secured tolling agreements with the other Individual Defendants.

**B. The Board's Refusal To Seek Tolling Agreements Was Unreasonable Under Delaware Law And Was Not A Valid Exercise Of Business Judgment**

157. As of the date of filing this complaint, Plaintiff's counsel has not received a response addressing the concerns detailed in their November 19, 2024, and December 9, 2024, letter concerning the Board's purported tolling agreements, particularly the tolling agreement with Pentland. The Board failed to act in good faith and within the realm of sound business judgment when it failed to respond to seek these tolling agreements thereby would have allowed the Company's valuable claims to expire worthless.

158. The Board's decision was not the result of an investigation into the Demand's allegations. Indeed, none of the Board's objections are remotely connected with Pentland's conduct, but rather with her status. The Board's decision thus lacked any reasonable basis and falls outside the bounds of what is considered a valid exercise of business judgment.

159. The Board's unwarranted and egregious refusal to seeking tolling agreements will unduly prejudice Plaintiff and the Company and is therefore a violation of Delaware law. The Board's actions thus constitute a wrongful refusal of the Demand. Accordingly, Plaintiff has satisfied any demand requirement and may pursue this action on behalf of the Company.

160. PayPal has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Board has not filed or authorized the filing of any lawsuits against any persons responsible for the wrongful conduct. Thus, the Board continues to breach their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches.

161. If PayPal's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers

Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the shareholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case may contain provisions that eliminate coverage for any action brought directly by PayPal against the Individual Defendants, known as the "insured versus insured exclusion."

162. As a result, if the Board were to sue any of themselves or certain of the officers of PayPal, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Board cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

163. Plaintiff has not made any demand on shareholders of PayPal to institute this action since such demand would be a futile and useless act for the following reasons:

a. PayPal is a publicly traded company with thousands of shareholders of record and at least hundreds of thousands of beneficial owners;

b. Making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of PayPal's shareholders; and

c. Making demand on all shareholders would force Plaintiff to incur excessive expenses and obstacles, assuming all shareholders could even be individually identified with any degree of certainty.

## IX. CLAIMS FOR RELIEF

### COUNT I
### Breach Of Fiduciary Duty
### (Against The Individual Defendants)

164. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

165. The Individual Defendants owed, and owe, PayPal fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed, and owe, PayPal the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision. In addition, the Individual Defendants had a duty to act in the best interests of the Company and its shareholders, and not to act in furtherance of their own self-interests.

166. As set forth herein, the Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision. The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

167. Additionally, as is also alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's disclosures were complete and accurate, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

168. As executive officers of PayPal and members of the Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor, the practices which resulted in violations of the law as alleged herein. Each of them had knowledge of, actively participated in, and/or approved of, or acquiesced in, the wrongdoings alleged herein, or abdicated his/her responsibilities with respect to these wrongdoings. The alleged acts of wrongdoing have subjected PayPal to unreasonable risks of loss and expenses.

169. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, PayPal has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

170. Plaintiff, on behalf of PayPal, have no adequate remedy at law.

**COUNT II**
**Breach Of Fiduciary Duty**
**(Against The Director Defendants)**

171. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

172. The Director Defendants owed, and owe, PayPal fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed, and owe, PayPal the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision. In addition, the Individual Defendants had a duty to act in the best interests of the Company and its shareholders, and not to act in furtherance of their own self-interests.

173. As set forth herein, the Director Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision. The Director Defendants failed to timely investigate the allegations set forth in the Demand and failed to secure tolling agreements with the Individual Defendants. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

174. As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, PayPal would have sustained significant damages. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

175. Plaintiff, on behalf of PayPal, have no adequate remedy at law.

**COUNT III**
**Unjust Enrichment**
**(Against All Defendants)**

176. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

177. By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of PayPal. Defendants were unjustly enriched as a result of the compensation and remuneration they received while breaching fiduciary duties owed to the Company.

178. Plaintiff, as a shareholder and representative of PayPal, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

179. Plaintiff, on behalf of PayPal, have no adequate remedy at law.

**COUNT IV**
**Breach Of Fiduciary Duty Through The Misappropriation Of Material, Non-Public Information Under *Brophy***
**(Against The Individual Defendants)**

180. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

181. At the time the Individual Defendants sold their PayPal stock, they knew the information described above and sold their stock on the basis of such information.

182. The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Individual Defendants misappropriated to their own benefit when they sold PayPal stock.

183. The Individual Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

184. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Individual Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Individual Defendants obtained thereby.

185. Plaintiff, on behalf of PayPal, has no adequate remedy at law.

**COUNT V**
**Contribution For Violations Of Sections 10(b) And 21D Of The Exchange Act**
**(Against Schulman, Rainey, And Auerbach)**

186. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

187. The conduct of the Individual Defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

188. PayPal is named as a defendant in a related securities fraud lawsuit which alleges and asserts claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If PayPal is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

189. As officers, directors and otherwise, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, PayPal's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

190. The Individual Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

191. The Individual Defendants have damaged the Company and is liable to the Company for contribution.

192. No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

Finding that Defendants have breached their fiduciary duties to the Company, wasted corporate assets, were unjustly enriched, and violated the federal securities laws;

A. Directing PayPal to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote on the following corporate governance proposals, actions, or policies:

- a proposal to strengthen the Company's accounting and disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and the public;
- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;
- a provision to permit the shareholders of PayPal to nominate three candidates for election to the Board;
- an accounting by the PayPal officers to the Company for all damages sustained, or to be sustained, by the Company by reason of the wrongs and misconduct complained of herein, and should make certain that no Company funds are used towards any settlement or resolution of the Securities Class Action, or any related or similar litigation;
- the termination, for cause, any Company employee responsible for the wrongdoing alleged herein;
- the return to the Company all salaries, bonuses, and the value of other remuneration of whatever kind paid to them during the time they were in breach of their fiduciary duties; and
- the payment of interest by PayPal officers, at the highest rate allowable by law, on the amount of damages sustained by the Company as a result of their culpable conduct.

B. Against each Defendant in favor of PayPal for the amount of damages sustained by PayPal, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

C. Requiring Defendants to return to PayPal all compensation and remuneration of whatever kind paid to them by the Company during the time that they were in breach of their fiduciary duties;

D. Directing Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that PayPal directors, officers, and employees do not engage in wrongful or illegal practices;

E. Granting additional appropriate equitable and/or injunctive relief to remedy Defendants' misconduct, as permitted by law;

F. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

G. Granting such other and further relief as this Court deems just and equitable.

## XI. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as to all issues so triable.

Respectfully submitted,

Dated: January 31, 2025

**JOHNSON FISTEL, LLP**

*/s/ Brett M. Middleton*
BRETT M. MIDDLETON

FRANK J. JOHNSON
BRETT M. MIDDLETON
JONATHAN M. SCOTT
BRYAN M. WYMAN
501 West Broadway, Suite 800
San Diego, California 92101
Telephone: (619) 230-0063
Email: FrankJ@johnsonfistel.com
BrettM@johnsonfistel.com
JonathanS@johnsonfistel.com
BryanW@johnsonfistel.com

*Counsel for Plaintiff*

# VERIFICATION

I, Curtis Spathias, hereby declare as follows:

I am the plaintiff in this action. I have reviewed the allegations made in the foregoing verified shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury pursuant that the foregoing is true and correct.

Signed and Accepted:

Dated: 1/30/2025

DocuSigned by:

98D1EC96744246B...

CURTIS SPATHIAS